**ORDERED.**

Dated: September 30, 2022

_____
Tiffany P. Geyer
United States Bankruptcy Judge

UNITED STATES BANKRUPTCY COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION
www.flmb.uscourts.gov

| | |
|---|---|
| In re ) | |
| ) | |
| Global Travel International, Inc., ) | Case No. 6:22-bk-438-TPG |
| ) | Chapter 11 |
| Debtor. ) | |
| ) | |

**MEMORANDUM OPINION CONFIRMING DEBTOR'S SUBCHAPTER V PLAN AND OVERRULING OBJECTION OF CREDITOR QUALPAY, INC.**

This case came on for hearing on June 23, 2022, to consider confirmation of the reorganization plan (Doc. No. 115) as modified (Doc. No. 120) (collectively, the "Plan") filed by the Debtor, Global Travel International, Inc. ("GTI"), and upon the objection to the Plan (Doc. No. 80) (the "Objection")[1] filed by creditor, Qualpay, Inc. ("Qualpay"). The primary disputed issue is whether the Plan impermissibly releases or permanently enjoins Qualpay from pursuing guaranty claims against one of the Debtor's principals, Randall J. Warren. After considering the evidence, testimony, arguments of counsel and the law, the Court confirms the Plan, which does not release or permanently enjoin Qualpay from pursuing its claims against Warren. Instead, the

---

[1] Several other creditors objected to an earlier version of the Debtor's Plan, but each was resolved by the time of the confirmation hearing. (Doc. Nos. 80, 82, 85).

1

Plan protects and preserves Qualpay's rights to pursue such claims by tolling applicable limitations periods during its three-year life and permits Qualpay to pursue its claims if the Debtor defaults in plan payments.

### **GTI's Background**

GTI is an Orlando-based travel company that has operated in the retail travel distribution space since approximately 1994. (GTI Ex. 6 ¶ 4.) GTI offers online hotel travel bookings and generates income from commissions, payment processing services, and managing subscription transactions. (*Id.*) GTI was historically successful; prior to the pandemic, in 2019 the Debtor generated approximately $21,000,000 (Doc. No. 9 at ¶ 5) in gross revenue and had multiple employees.

The Debtor's problems began in early 2019 when it discovered an embezzlement scheme being perpetrated by an internal staff accountant. (GTI Ex. 6 ¶ 5.) Approximately $1.2 million was misappropriated, disrupting the Debtor's operations and cash flow. (*Id.*) The Debtor fell behind on its financial obligations. Making matters worse, the Coronavirus emerged in 2020 and generally devastated the travel industry, including the business of GTI. (*Id.*) GTI's staff was "completely gutted." (*Id.* at ¶ 6.) Hotel bookings quickly dried up and GTI was unable to fund its operations and pay its vendors and merchant processing companies. (*Id.* at ¶ 5.) Payment demands mounted and lawsuits were filed. When GTI fell behind on its payments, Qualpay pursued an arbitration proceeding against Warren on guaranty claims. Warren strenuously contests any liability on the guaranty. The parties also disagree on how close the arbitration proceedings are to conclusion: Qualpay says the case is nearly wrapped up, and GTI says much remains to be done.

**GTI's Bankruptcy Case**

On February 7, 2022, GTI filed this Chapter 11 Subchapter V case in hopes of restructuring and bringing its business back to life as the pandemic subsides and people resume travel. When GTI filed this case, it also filed an adversary proceeding[2] seeking a temporary restraining order and preliminary injunction protecting Warren from litigation while it developed a reorganization plan, which relief the Court granted.[3] The Debtor's operations have been skeletally staffed by one full-time non-insider employee and two officer/affiliate employees, Warren and Michael Gross. Neither Warren nor Gross received any compensation from the Debtor for their work during this case. Gross is GTI's "rainmaker," according to Warren.[4] As for Warren, he averred that he has been working well over forty hours per week, sometimes over sixty hours per week, throughout the bankruptcy case and he expects to continue at this pace for the foreseeable future. (6:22-ap-00034-TPG, Doc. 2 at 7 ¶ 1). The Debtor is operating on a cash flow positive basis, but the margins are thin. (Doc. No. 25 at 3; Doc. No. 44 at 3; Doc. No. 65 at 3; Doc. No. 111 at 3.)

The first plan the Debtor proposed drew objections from several creditors (Doc. Nos. 80, 82, 85), but the parties worked diligently together to resolve all issues. At the confirmation hearing, the Subchapter V Trustee, Aaron R. Cohen, noted a very high level of creditor participation in this case, and that the parties worked diligently and collaboratively to resolve all

---

[2] Case No. 6:22-ap-00034-TPG.

[3] On April 15, 2022, the Court granted GTI's motion for a temporary restraining order, enjoining Qualpay from proceeding with its claims in arbitration against Warren. (Case No. 6:22-ap-00034-TPG, Doc. No. 26.) Subsequently, the Court granted GTI's motion for a preliminary injunction enjoining the arbitration proceeding until June 8, 2022. (Case No. 6:22-ap-00034-TPG, Doc. No. 33.) At the confirmation hearing, the Court further extended the injunction while the matter of plan confirmation was under advisement.

[4] Warren testified at the confirmation hearing but Gross did not.

issues. Qualpay's objection was the only one that was not resolved by the time of the confirmation hearing, but Qualpay is the only creditor asserting guaranty claims.

## **The Plan**

The Plan provides for continued ordinary course operations and bases its projections on GTI providing payment processing support services to GTI's affiliates. Warren and Gross will continue to operate GTI. (Doc. No. 115 at 25.) GTI is anticipating new customers for its payment processing support services and may bring its dormant website "Hotelpower.com" back to life as people resume travel and fears of the pandemic subside. (*Id.* at 23-24; Art. VI (A).)

The Plan contains just two classes—one for general unsecured claims (Class 2) and one for equity interests (Class 3).[5] (Doc. No. 115 at 15.) Allowed unsecured Class 2 claims receive pro rata distributions from the Debtor's disposable income in quarterly installments during the three-year Plan, after administrative and priority claims are paid in full. (*Id.*) In addition, members of Class 2 receive a pro rata share of any proceeds from certain causes of action once higher priority claims are fully paid. (*Id.*) The Plan provides for quarterly reporting and includes a mechanism for interested parties to object to GTI's calculation of disposable income. (*Id.* at 16). GTI will also supply its tax returns to any member of Class 2 who so requests. (*Id.*) The Plan limits officer compensation to Warren and Gross for their post-confirmation work; compensation shall not exceed 10% (split equally) of the difference between GTI's actual net disposable income and projected net disposable income (*id.* at 19), and Warren and Gross retain their equity (*id.* at 20).

---

[5] The Debtor's first plan proposed two classes of general unsecured creditors, but Class 1 was deleted in the final iteration of the Plan, which placed all allowed claims of general unsecured creditors in Class 2. In the first plan, Qualpay was among three payment processors invited to elect treatment under Class 1 rather than Class 2 (Doc. No. 49 at 15), but Qualpay preferred treatment in Class 2, concluding that Class 1 treatment was undesirable (Doc. No. 80 at 4 n.5).

The Plan carried Class 2's support: 71.72% of allowed unsecured claims, representing $732,745.95, voted to accept[6] the Plan and 28.28% of allowed unsecured claims, representing only Qualpay's $288,596.70 claim, voted[7] to reject the Plan. (Ex. 5, Second Amended Ballot Tabulation). Qualpay was the only creditor to vote against the Plan, but again Qualpay is the only creditor pursuing personal guaranty claims against one of the Debtor's principals, and the Plan seeks to further pause[8] those claims.

Specifically, the Plan contains a "conditional temporal injunction" (Ex. 6 at 16) protecting Warren and Gross so long as the Debtor is performing under the Plan (Doc. No. 115 at 36-39, Art. VII(S)). The Plan defines Warren and Gross as "Protected Parties" who will contribute, collectively, a total of $25,000 towards the Plan and continue to devote their time, resources, and industry knowledge towards the successful completion of the Plan for the benefit of creditors, provided that they obtain an injunction during the Plan's three-year life, freeing them from defending claims deriving from the Debtor's business. In addition, the Plan tolls and abates all statutes of limitations so that enjoined parties can pick up where they left off after the Plan if claims remain. (Doc. No. 115 at 37.) So, if Qualpay's claim is not satisfied under the Plan, Qualpay can resume collection efforts against Warren on whatever amount remains. In exchange for the $25,000 contribution, the tolling of statutes of limitations, working for no compensation during the bankruptcy case, limiting their compensation under the Plan, and for devoting their time, industry knowledge and expertise to revitalizing the Debtor, the Debtor

---

[6] At the hearing, GTI's counsel made an ore tenus motion to allow a late filed ballot by creditor Orlando Bramingham, Inc. (Doc. No. 124), which motion the Court granted (Doc. No. 129).

[7] Qualpay and GTI agreed Qualpay would have a claim in an amount certain for the purposes of voting on the Plan but reserved all other rights. (Doc. No. 125.)

[8] *See* n. 3 *supra*.

argues the proposed injunction is fair and that absent the injunction, protracted litigation will drag on, to the detriment of the Debtor, by depleting its assets— primarily Warren—jeopardizing the Debtor's restructuring.

### **Qualpay's Objection to Plan Confirmation**

Qualpay makes several arguments as to why the Plan should not be confirmed, noting that average cash flow, as reflected in the Debtor's monthly operating reports has been low even without the Debtor paying Warren and Gross during this case, and moreover, unsecured creditors have no means to calculate their anticipated recoveries because the universe of unsecured claims is unknown. (Doc. No. 80 at 4-5.) In addition, Qualpay argued that it is receiving worse treatment under the Plan than other Class 2 creditors because the Plan forces it to give up its rights to pursue Warren. (*Id.* at 16.) Therefore, the Plan cannot be confirmed because it violates 11 U.S.C. § 1123(a)(4), which requires a Chapter 11 plan to "provide the same treatment for each claim or interest in a particular class, unless the holder of a particular claim or interest agrees to a less favorable treatment." *Id.* at 15-16 (quoting 11 U.S.C. § 1123(a)(4)). But Qualpay's primary argument is that the Plan contains an impermissible third-party release which amounts to a discharge of claims against Warren, a non-debtor, expressly in violation of 11 U.S.C. § 524(e). (*Id.* at 6-15.) The Court does not agree that the Plan contains a third-party release or a permanent bar forever enjoining Qualpay from pursuing whatever rights it may possess against Warren on its guaranty claims. Nevertheless, because Qualpay's rights *are* impacted, albeit conditionally and for a limited time, the factors enumerated in *Dow Corning* are instructive.

## **The Court will Apply the *Dow Corning* Factors**

Bankruptcy courts in the Eleventh Circuit are advised to consult the factors set forth by the Sixth Circuit in *In re Dow Corning Corp.*, 280 F.3d 648, 658 (6th Cir. 2002) when evaluating a bar order. *In re Seaside Eng'g & Surveying, Inc.*, 780 F.3d 1070, 1079 (11th Cir. 2015). Although the Debtor is not seeking a permanent bar order here, the Court finds an evaluation of the *Dow Corning* factors to be helpful. Specifically, whether: (1) there is an identity of interests between the debtor and the third party, usually an indemnity relationship, such that a suit against the non-debtor is, in essence, a suit against the debtor or will deplete the assets of the estate; (2) the non-debtor has contributed substantial assets to the reorganization; (3) the injunction is essential to reorganization, namely, the reorganization hinges on the debtor being free from indirect suits against parties who would have indemnity or contribution claims against the debtor; (4) the impacted class, or classes, has overwhelmingly voted to accept the plan; (5) the plan provides a mechanism to pay for all, or substantially all, of the class or classes affected by the injunction; and (6) the plan provides an opportunity for those claimants who choose not to settle to recover in full. *In re Dow Corning Corp.*, 280 F.3d at 658. The list is nonexclusive and flexibly applied. *In re Seaside Eng'g & Surveying, Inc.*, 780 F.3d at 1079.

Bar orders must be essential to a successful reorganization, fair, and used cautiously and infrequently. *Id.* at 1078. Bankruptcy courts must make a record of specific factual findings that support their conclusions when entering bar orders, but also have discretion to determine which *Dow Corning* factors are relevant in each case. *Id.* at 1079. The Court analyzes each relevant *Dow Corning* factor below.

### **Analysis of *Dow Corning* Factors Merits Plan Injunction**

*Factor One:  There is an identity of interests between the Debtor and Warren and a suit against Warren will deplete the Debtor's assets.*

Although there was no evidence GTI has obligations to indemnify Warren, the Court finds that, because *Warren is the Debtor's primary asset*, a suit against him amounts to a suit against the Debtor and will unnecessarily distract him from what must be his primary, if not exclusive, focus during the life of the Plan—restoring the Debtor to achieve maximum profits for the benefit of GTI's creditor body. At the hearing, Warren testified that the arbitration is "massively consuming," and if it proceeds against him, then the Debtor will need to hire a replacement for him at a cost of $100,000 to $150,000 while he is defending the arbitration. (June 23, 2022 Evidentiary Hr'g at 2:29.) Warren testified that he is "all in" regarding getting the Debtor back on track (*Id.*), and the Court concludes he should not be distracted from this effort. GTI's most substantial asset is its human capital, and its operations, due to the pandemic, have been cut back and only skeletally staffed. Without Warren, the business of GTI would suffer.

Regarding Gross, Warren credits him as being GTI's rainmaker whose efforts are also critical to GTI's future success, and this testimony was unrefuted. Because of this, the Court finds that the proposed injunction is essential to the reorganization due to the identity of interests between the Debtor and Warren and Gross. Further, there was no evidence or suggestion by any party that claims of the manner proposed to be enjoined are being pursued against Gross, and no creditor objected to his receipt of an injunction during the life of the Plan.

*Factor Two: The Protected Parties contributed substantial assets to the reorganization.*

During this case Warren and Gross contributed their labor and industry knowledge to GTI's restructuring for zero compensation for approximately eight months during which time the Debtor was cash flow positive. In addition, collectively they are devoting $25,000 to the Plan,

8

which will be used to defray administrative expenses, benefitting Class 2. Warren and Gross have also limited their going forward compensation in a manner that is fair and equitable as it limits their total collective compensation to no more than 10% of the difference between GTI's actual net disposable income and projected net disposable income (Doc. No. 115 at 19). The Court finds that, under the circumstances, this is substantial and sufficient consideration for the temporary injunction in the Plan.

> ### *Factor Three: Although the Protected Parties do not appear to have indemnity or contribution claims against the Debtor, the injunction is nevertheless essential to the reorganization.*

As stated above in the Factor One analysis, there was no evidence that the Debtor has an indemnity relationship with either of the Protected Parties. But the Court has already found that the relationship between the Debtor and Warren is such that Warren effectively *is* the Debtor. At a minimum, Warren and Gross are the Debtor's main assets: Warren does the "work" and Gross generates business. Both members of the team are critical. As such, the injunction is essential to the reorganization.

In *In re Seawalk Investments, LLC*, No. 3:19-bk-1010-JAF, 2021 WL 5016600 (Bankr. M.D. Fla. Oct. 28, 2021), the Court analyzed the *Dow Corning* factors and approved a Plan which prevented a creditor from pursing a guarantor of the debtor's obligations where a judgment against the guarantor would permit the creditor to levy against his equity in a hotel— the Debtor's "main asset"— and "crush its reorganization efforts." No. 3:19-BK-1010-JAF, 2021 WL 5016600, at *12. In *Seawalk*, as in this case, the plan provided that, in the event of a default, the injunction would cease to apply. *Id.* at *13. In *Seawalk*, the Debtor's main asset was a hotel, and here the Debtor's main assets are its people, but the same analysis applies, and the same conclusion is merited. The injunction is essential to the Debtor's reorganization efforts.

*Factor Four: The impacted class has overwhelmingly voted to accept the Plan.*

Class 2 voted overwhelmingly to accept the Plan. However, this is an oversimplification because the only Class 2 creditor impacted by the Plan's injunction is Qualpay, whose rights to pursue Warren on the contested guaranty claim are being delayed, and not insubstantially, under the Plan.[9] Qualpay argues that this is unfair and that it is being treated differently than other members of Class 2 in violation of 11 U.S.C. § 1123(a)(4), which requires a Chapter 11 plan to "provide the same treatment for each claim or interest in a particular class, unless the holder of a particular claim or interest agrees to a less favorable treatment." (Doc. No. 80 at 15-16.) Qualpay argued that it is receiving worse treatment under the Plan than other Class 2 creditors because the Plan forces it to give up its rights to pursue Warren. (*Id.* at 16.)

As explained in *In re Schroeder*, No. 3:21-BK-00707-LVV, 2021 WL 5749836, at *9 (Bankr. M.D. Fla. Dec. 1, 2021), Section 1122(a) of the Bankruptcy Code permits a plan to place "substantially similar" claims or interests in the same class. *Id.* at *9 (citing 11 U.S.C. § 1122(a)). "The Code does not define either 'similarity' or 'substantial similarity.' While there is ample case law on the topic of permissible separate classification of claims that are assumed to be similar, there is a paucity of case law defining what constitutes either similarity or substantial similarity of claims." *In re LOOP 76, LLC*, 442 B.R. 713, 716 (Bankr. D. Ariz. 2010), *aff'd*, 465 B.R. 525 (B.A.P. 9th Cir. 2012), *aff'd*, 578 F. App'x 644 (9th Cir. 2014). Courts have come to

---

[9] Although Qualpay objected to Warren's receipt of a plan injunction, Qualpay, having no claims against Gross, lacked standing to object to the application of the injunction to Gross. *In re Morris Pub. Grp. LLC*, No. 10-10134, 2010 WL 599393, at *3 (Bankr. S.D. Ga. Feb. 10, 2010) ("To establish standing to object to confirmation, a party in interest under § 1109(b) must possess a legally protected interest affected by confirmation. As to creditors, only those whose pre-petition rights are impaired under the plan have legally protected interests affected by confirmation.") (internal citations omitted)). Because there is no information in the record regarding whether Gross has liability to third parties relating to the Debtor's business, and because there was no objection to Gross receiving the benefit of the same injunction which will be received by Warren under the Plan, the Court will not address the issue further.

different conclusions on whether a personal guaranty renders a claim dissimilar from claims without guaranties. *Compare Steelcase, Inc. v. Johnston (In re Johnston)*, 21 F.3d 323, 328 (9th Cir. 1994) (applying a business or economic justification standard, the existence of a personal guaranty from the debtor's principal rendered claim dissimilar to other claims) *with In re Hanish, LLC*, 570 B.R. 4, 15 (Bankr. D.N.H. 2017) (noting that the prevailing view in the First Circuit "is that a personal guaranty does not alter the legal character of a claim as it relates to the assets of the debtor.")

Here, however, Qualpay did not object to its classification in Class 2[10] and was not interested in treatment under Class 1 in the Debtor's initial plan. (Doc. No. 80 at 4 n.5.) Rather, it argues it is being treated unfairly by having to give up rights that the other members of Class 2 do not. The Court rejects this argument. Qualpay's claim against the Debtor is being treated the same as the claims of the others in Class 2 because each claim is being paid by the Debtor in the same manner under the Plan. The key to the Court's conclusion on this point is that Qualpay's claim is of the same legal character – unsecured – as the other members of Class 2 "*as it relates to the assets of the debtor.*" *In re Los Angeles Land & Invs., Ltd.*, 282 F. Supp. 448, 453-54 (D. Haw. 1968), *aff'd,* 447 F.2d 1366 (9th Cir. 1971) (emphasis added). In this case, the fact that Qualpay has a guaranty against one of the Debtor's principals is of no moment. Its rights against the Debtor are the same as the other members of Class 2. Class 2 overwhelming voted to accept the Plan, and Qualpay is not being treated unfairly.

---

[10] As a practical matter, if the Debtor had placed Qualpay in a separate class under the Plan and Qualpay still voted to reject the Plan, then the Debtor could have crammed the Plan down based on Class 2's acceptance of the Plan, which is possibly why Qualpay did not argue the personal guaranty rendered its claim dissimilar to the unsecured claims of other members of Class 2.

### Factor Five:   The Plan provides a mechanism to pay Qualpay as the only party affected by the injunction.

Qualpay will receive payment under the Plan in the same manner as every other member of Class 2. And Qualpay's rights to pursue Warren on its guaranty claims are expressly preserved, as discussed below. As such, the Plan contains a mechanism to compensate Qualpay and preserve Qualpay's rights during the period of the injunction as the only member of the class affected by the injunction.

### Factor Six:   The Plan provides Qualpay with the opportunity to recover on its claim in full.

The sixth factor courts consider in approving a bar order is whether the plan provides an opportunity for those claimants who choose not to settle to recover in full. Here, however, there is no settlement, per se. Rather, there was simply a majority vote to accept the Debtor's proposed treatment of Class 2 over Qualpay's lone dissent.  The issue then is really whether the Plan leaves Qualpay's rights intact, and the Court finds that it does, as the Plan tolls and abates all statutes of limitations and deadlines during its three-year life. (Doc. No. 115 at 37.) If Qualpay has a claim against the Debtor that is unsatisfied at the conclusion of the Plan, Qualpay can continue to proceed against Warren on its guaranty claims. As such, the Plan provides Qualpay with the opportunity to recover on its claims, to whatever extent it may prevail against Warren on the contested guaranty liability.

In sum, the Court finds that the Plan does not contain a nonconsensual third-party release. Qualpay's Objection (Doc. No. 80) is overruled, and the Plan is confirmed. Counsel for GTI is directed to submit an order confirming the Plan consistent with this Memorandum Opinion.

###

Daniel Velasquez is directed to serve a copy of this memorandum opinion on interested parties who do not receive service by CM/ECF and file a proof of service within three days of entry of this order.